1

2                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
3                         EASTERN DIVISION

4

   UNITED STATES OF AMERICA,          Case No. 08CR290
5
              Plaintiff,
6                                      Tuesday, June 24, 2008

7         vs.                          2:45 p.m.

8   JESSE CECENA,
    SERGIO DURAZO,
9
              Defendants.
10

11

          TRANSCRIPT OF PRELIMINARY/DETENTION HEARING
12        BEFORE THE HONORABLE WILLIAM H. BAUGHMAN
                UNITED STATES MAGISTRATE JUDGE
13

14

    APPEARANCES:
15
    For the Government:          Robert E. Bulford, Jr.,
16                               Assistant United States Attorney
                                 208 U.S. Court House
17                               2 South Main Street
                                 Akron, Ohio   44308
18
    For Defendant Cecena:        Timothy Ivey,
19                               Assistant Fed. Public Defender
                                 1660 West Second Street
20                               Skylight Office Tower, # 750
                                 Cleveland, Ohio    44114
21                               (216) 522-4856

22   For Defendant Durazo:       Lawrence Delino, Jr., Esq.
                                 Suite 1450
23                               One Cascade Plaza
                                 Akron, Ohio    44308
24

25

1          THE COURT:  Ms. Hach, call the cases.

2          THE CLERK:  United States of America versus

3     Sergio Durazo, Case Number 1:08MJ9031, and United States of

4     America versus Jesse Cecena, Case Number 1:08MJ9032.

5          THE COURT:  Counsel for the United States, are

6     you ready to proceed?

7          MR. BULFORD:  Yes, Your Honor.

8          THE COURT:  State your appearance for the

9     record, please.

10          MR. BULFORD:  On behalf of the United States,

11     Assistant United States Attorney Robert Bulford.

12          THE COURT:  Counsel for Mr. Durazo, are you

13     ready to proceed?

14          MR. DELINO:  Yes, Your Honor.

15          THE COURT:  Your appearance, please.

16          MR. DELINO:  Lawrence Delino for defendant

17     Sergio Durazo.

18          THE COURT:  And counsel for Mr. Cecena?

19          MR. IVEY:  We're ready to proceed.  Attorney

20     Timothy Ivey for Mr. Cecena.

21          THE COURT:  All right.  Very well.  We are

22     here today on the motion of the United States for detention

23     and the request of the defendants for a preliminary hearing.

24          Mr. Bulford, you may proceed.

25          MR. BULFORD:  Thank you, Your Honor.

1    We would waive opening statement and proceed

2  with the witnesses.

3            THE COURT:  Please call your witness.

4                  MARK SCHOONOVER,

5      of lawful age, a witness called by the Government,

6            being first duly sworn, was examined

7                and testified as follows:

8      DIRECT EXAMINATION OF MARK SCHOONOVER

9  BY MR. BULFORD:

14:46:04 10  Q.    Sir, tell us your name, please, and spell your last

11  name.

12  A.    Mark Schoonover, S-C-H-double O-N-O-V-E-R.

13  Q.    Where do you work, sir?

14  A.    I'm an Agent with Medina County drug task force and

14:46:18 15  TFO with Drug Enforcement Administration.

16  Q.    TFO stands for what?

17  A.    Task force officer.

18  Q.    And so you're sworn as a federal agent on specific

19  cases, is that right?

14:46:28 20  A.    Yes, sir.

21  Q.    And were you so sworn in the case of investigation of

22  an organization headed by Chevaliee Robinson?

23  A.    Yes, sir.

24  Q.    And approximately how long have you been involved in

14:46:42 25  that investigation?

1    A.    Approximately two years.

2    Q.    And that investigation of Chevaliee Robinson, did that

3    culminate in indictments last fall with an arrest on

4    December 5th of 2007?

14:46:54 5    A.    Yes, sir.

6    Q.    And that was approximately 13 individuals who were

7    arrested?

8    A.    Yes, sir.

9    Q.    And just so the Court has a background, Chevaliee

14:47:00 10    Robinson, who is he?

11    A.    He was a head of a drug distribution ring in the

12    Akron, Ohio area.

13    Q.    What type of drugs were they involved with?

14    A.    Primarily marijuana and some cocaine.

14:47:14 15    Q.    And who was Amanda Carrington?

16    A.    Amanda Carrington was Mr. Robinson's significant

17    other.  They weren't actually married.

18    Q.    Do they have children together?

19    A.    They have, I believe, three children.

14:47:26 20    Q.    And they lived together, is that right?

21    A.    Yes, sir.

22    Q.    Was she also indicted in the --

23    A.    She's a co- --

24    Q.    -- cocaine trafficking and money laundering case?

14:47:38 25    A.    Yes, she's a co-defendant.

1    Q.    And who was Reginald Dove?

2    A.    Reginald Dove is also an indicted co-defendant.

3    Q.    They were arrested on December 5th, is that right,

4    2007?

14:47:46  5    A.    Correct.

6    Q.    And after their arrest, did there come a time when

7    they both spoke with authorities?

8    A.    Shortly thereafter.

9    Q.    And were you involved in the interview of Amanda

14:47:56 10    Carrington?

11    A.    Yes.

12    Q.    Were you involved in the interview of Reginald Dove?

13    A.    Yes.

14    Q.    And during the course of the interview of Amanda

14:48:04 15    Carrington, did you learn of a Mexican drug supplier?

16    A.    Yes, I did.

17    Q.    What did you learn?

18    A.    That Sergio Durazo was reaching out or contacting

19    Amanda Carrington to deliver a quantity of drugs to Akron,

14:48:20 20    Ohio.

21    Q.    And did Amanda Carrington know of or know Mr. Durazo

22    prior to her arrest?

23    A.    She stated he has been to her home.

24    Q.    Was she --

14:48:36 25    A.    Prior, prior to their arrest.

1    Q.    Did she know if he was involved with Chevaliee

2    Robinson?

3    A.    She was aware that he was Mr. Robinson's source of

4    supply.

14:48:44 5    Q.    Now, did she tell you about a trip in November of '07

6    involving Reginald Dove?

7    A.    She said that November of 2007 she asked Reginald Dove

8    to travel to Arizona to meet Mr. Durazo, and Mr. Dove did so

9    and they agreed to -- Mr. Dove and Mr. Durazo agreed to

14:49:10 10    engage in a drug transaction involving 500 pounds of

11    marijuana.

12    Q.    Now, at the time in November, where was Chevaliee

13    Robinson?

14    A.    He was incarcerated in prison.

14:49:22 15    Q.    Was that state prison?

16    A.    State prison, yes.

17    Q.    Had he been arrested in February of '07?

18    A.    On, yes, with possession of 600 pounds of marijuana.

19    Q.    Okay.  And that was a kind of a walled off seizure

14:49:34 20    from this case, is that correct?

21    A.    Correct.

22    Q.    What's a walled off seizure?

23    A.    You do it so the defendant -- in this case it would

24    have been Mr. Robinson -- wouldn't know the extent of

14:49:44 25    the -- the full extent of the investigation, of the ongoing

1    investigation.

2    Q.    And how much, when Mr. Robinson was arrested in

3    November -- excuse me -- February of '07, how much marijuana

4    was in the truck that he was stopped in?

14:49:58  5    A.    Six hundred pounds.

6    Q.    Okay.  Now, did you learn in January of '08, about a

7    month after the arrest, was there a contact between Mr. Dove

8    and Mr. Durazo?

9    A.    Yes.  Telephone contact.

14:50:12  10    Q.    And how do you know about that?

11    A.    Mr. Dove told us so, and told us that Mr. Durazo was

12    going to come to the Akron, Ohio area and deliver a quantity

13    of marijuana.

14    Q.    And were some of those January phone calls recorded?

14:50:30  15    A.    Mr. Dove recorded them, yes.

16    Q.    And gave the recordings to you?

17    A.    Gave them to Agent Rowland.

18    Q.    Incidentally, prior to January of '08 and prior to

19    December of '07, had you ever seen Mr. Durazo before?

14:50:50  20    A.    First time I saw Mr. Durazo was February 12th or 13th

21    of 2007 at the Best Western Motel in Copley, Ohio.

22    Q.    And what was the context of that sighting?

23    A.    He was meeting with Mr. Robinson over a period of

24    days.

14:51:12  25    Q.    Was Mr. Dove involved in those meetings?

1   A.    Mr. Dove obtained the motel room for Mr. Durazo and

2   provided Mr. Durazo with a vehicle of his own to drive.

3   Q.    All right.  Now, so you were able to listen along with

4   other agents to the phone call that Mr. Dove recorded of

14:51:34 5   Mr. Durazo in January of '08, is that right?

6   A.    Yes, sir.

7   Q.    And what was the subject of that phone call?

8   A.    That he -- he was going -- it was vague.  No dates.

9   That he was going to be -- he felt comfortable with Mr. Dove

14:51:50 10   and he was going to be bringing a load of marijuana into the

11   Akron, Ohio area, wanted to know if Mr. Dove had everything

12   ready, meaning did you have a motel room for him, vehicle

13   for him, and an off load site which would be a warehouse to

14   unload the marijuana.

14:52:10 15   Q.    All right.  Now, that, a delivery of marijuana, did

16   not occur in January of '08, did it?

17   A.    No, sir.

18   Q.    Did it in February of '08?

19   A.    No, sir.

14:52:20 20   Q.    Now, during the course of following up on the arrested

21   subjects, Mr. Dove was interviewed several times, is that

22   right?

23   A.    That's correct.

24   Q.    With his attorney present, is that right?

14:52:28 25   A.    Yes, sir.

1    Q.    And were you present in those proffer situations?

2    A.    Yes, sir.

3    Q.    And did Mr. Dove give information about Mr. Durazo

4    during those?

14:52:36 5    A.    Yes, he did.

6    Q.    All right.  Did he agree to continue to cooperate, and

7    if Mr. Durazo called, that he would follow through and try

8    to purchase some marijuana from him?

9    A.    Yes.  He agreed.  He agreed to all the above.

14:52:48 10    Q.    All right.  Now, on May 13th, 2008, did Durazo contact

11    Reginald Dove?

12    A.    Contacted Mr. Dove again, told Mr. Dove he'd be here

13    no less than six days, no more than ten days.

14    Q.    Did he indicate why he hadn't contacted him for two

14:53:06 15    months?

16    A.    He said his daughter had cancer and that he was

17    tending to his daughter's medical needs.

18    Q.    And did he indicate why he was going to contact him

19    and come here?

14:53:16 20    A.    Deliver 500 pounds of marijuana.

21    Q.    Did he again ask if he had everything in place?

22    A.    Yes, everything in place, meaning motel room, off load

23    site and a vehicle for him to drive.

24    Q.    And how did Dove indicate that he knew that --

14:53:36 25    A.    Mr. Dove indicated he knew he was ready to go.

1  Mr. Dove had been involved back in February of '07, whenever

2  Mr. Durazo was here, and Mr. Dove had done those things

3  before.

4  Q.    Now, did Mr. Durazo show up in May?

14:53:50 5  A.    No, he did not.

6  Q.    All right.  Now, I want to call your attention to

7  Wednesday, June 11th, 2008.

8          There was a contact between Durazo and Dove?

9  A.    Mr. Durazo contacted Mr. Dove.  Mr. Dove recorded the

14:54:02 10  phone call.  Mr. Durazo told Mr. Dove that he was -- be

11  there in two days, he was leaving tonight and he was leaving

12  with 300.

13  Q.    And did Dove tell you what he thought 300 meant?

14  A.    Three hundred meant three hundred pounds of marijuana.

14:54:20 15  Q.    And Dove immediately contacted you, the agents, and

16  told them about this?

17  A.    Correct.

18  Q.    And what did you do to coordinate the events that

19  occurred?

14:54:28 20  A.    Myself and Agent Rowland met with Mr. Dove and, along

21  with the Summit County drug unit, we formulated a plan for

22  if and when Mr. Durazo came to this area.

23  Q.    All right.  Now, I'll call your attention to Friday,

24  June 13th, 2008.

14:54:48 25          Was there contact between Dove and Durazo?

1  A.    Mr. Durazo called Mr. Dove, said that he was in town

2  and he needed picked up at Bob Evans Restaurant located on

3  Gilcrest Road in Akron, Ohio.

4  Q.    And that is -- actually that's in this district, isn't

14:55:06  5  it?

6  A.    Yes, it is.

7  Q.    Now, learning that, what did you do?

8  A.    We wired Mr. Dove up.  Wiring him up meaning we put a

9  body wire on Mr. Dove which enabled the conversations

14:55:22 10  between Mr. Dove and the defendants to be recorded and

11  monitored by surveillance units.

12  Q.    Before we go any further, the phone conversations that

13  Mr. Dove recorded, you or Chuck Rowland or one of the other

14  agents listened to those, is that right?

14:55:36 15  A.    Yes.

16  Q.    And were they consistent with Mr. Dove's summary of

17  what had happened?

18  A.    Yes, they were.

19  Q.    Okay.  Now, so you wired Mr. Dove up.

14:55:44 20       What did you do next?

21  A.    Followed Mr. Dove.  Mr. Dove proceeded to the area of

22  the Bob Evans Restaurant on Gilcrest Road.  In transit to

23  the Bob Evans Restaurant, he was -- received an incoming

24  phone call, he was told to pick him up at the -- I think

14:56:04 25  it's a Marathon gas station which is located at the

1    intersection of Interstate 76 and Gilcrest Road.

2    Q.    That's in front of the Best Western restaurant, isn't

3    it?  I mean --

4    A.    It actually was -- they actually were sitting under

14:56:18 5    the veranda.  The Best Western Motel on Gilcrest Road is

6    where Mr. Dove picked up Mr. Durazo and Mr. Cecena and one

7    other male.

8    Q.    All right.  Now, at that time did you see the pickup?

9    A.    No.  I saw Mr. Durazo, Mr. Cecena and the other

14:56:38 10   Hispanic male sitting under the veranda of the Best Western.

11   Q.    All right.  So there were three gentlemen?

12   A.    There were three.

13   Q.    Together?

14   A.    Yes, sir.

14:56:48 15   Q.    And could you point out Mr. Durazo here in the

16   courtroom?  Is he here today?

17   A.    Mr. Durazo's sitting -- wearing an orange jumpsuit

18   sitting at the defendant's table with dark colored hair.

19   Q.    Is he -- which part of the table is he at?

14:57:06 20   A.    It would be at the end.

21            MR. BULFORD:  All right.  Let the record

22   reflect he has identified --

23            THE COURT:  So noted.

24   BY MR. BULFORD:

14:57:12 25   Q.    The other gentleman you described, Mr. Cecena?

```
 1    A.    Cecena.

 2    Q.    Is he in the courtroom?

 3    A.    Yes, he is.

 4    Q.    Would you point him out, please?

 5    A.    Sitting next to his attorney Mr. Ivey, orange

 6    jumpsuit, mixed colored hair being black and gray.

 7    Q.    All right.  Now, they were picked up by Mr. Dove?

 8    A.    Yes, sir.

 9    Q.    What was Mr. Dove driving?

10    A.    His -- I think it's an SUV Nissan.

11    Q.    Okay.

12    A.    I believe.

13    Q.    That's his very own car?

14    A.    Yes, sir.

15    Q.    You didn't provide a car for him, is that right?

16    A.    No, sir.

17    Q.    All right.  Now, who all got in the car?

18    A.    Mr. Durazo, Mr. Cecena, and the other unknown male.

19    Q.    Okay.  And where did they go after they left the

20    Gilcrest Road area?

21    A.    Went to the Best Western Hotel located on Montrose

22    Drive in Copley, Ohio.

23    Q.    So now they went to the west side of Akron, north --

24    A.    East side of Akron to the far west side.

25    Q.    Going 76 to 77 or are they going --
```

1    A.    76 to 77 to Route 18 to Montrose Drive to the Best

2    Western Hotel.

3    Q.    The Best Western is on the south side of 18 so that's

4    in Copley?

5    A.    Yes, sir.

6    Q.    Okay.  Now, what did you observe or what did you hear

7    there?

8    A.    Mr. Dove went in, got -- obtained a motel room, came

9    back out.  Mr. Cecena and the other unidentified male went

10    into the hotel.

11              Mr. Durazo and Mr. Dove then departed the

12    motel in Mr. Dove's vehicle.

13    Q.    All right.  Now, were there any conversations during

14    the trip from Gilcrest Road to the Montrose area about

15    marijuana?

16    A.    Yes, there was.

17    Q.    What was the substance of those conversations?

18    A.    About the load coming in, how much -- if he was going

19    to have everything ready.  It was in Fort Wayne, Indiana and

20    he needed people -- somebody to go pick it up.

21              He thought he would need somebody to go pick

22    it up.

23    Q.    All right.  So he was saying that the marijuana was

24    already at Fort Wayne, Indiana?

25    A.    He would refer to it in that -- sometimes he would say

1   Fort Wayne. Sometimes he would refer to it as next door.

2   Q.   Okay. All right. Now, when that conversation was

3   going on, that was in the car on the way over to Montrose,

4   is that right?

14:59:36 5   A.   Yes.

6   Q.   And then after -- now, who rented the hotel?

7   A.   Mr. Dove.

8   Q.   So Mr. Dove went in and put the hotel in his name?

9   A.   Yes.

14:59:48 10   Q.   And what, did he pay cash or do you know?

11   A.   He paid cash, supplied -- his money was supplied to

12   him by us.

13   Q.   So task force gave him the money?

14   A.   Yes, sir.

14:59:56 15   Q.   All right. But who instructed him to rent the hotel

16   room?

17   A.   Agent Rowland.

18   Q.   No, I mean during, during the --

19   A.   Mr. Durazo. Mr. Dove was already aware, because he

15:00:08 20   had had -- he's done this before, he was already aware that

21   he was going to have to give Mr. Durazo -- get Mr. Durazo a

22   motel room. And in the past he had to give him money and he

23   also had had to get Mr. Durazo a vehicle.

24   Q.   And in the past, he gave a vehicle. What vehicles

15:00:28 25   would he give him?

1    A.    He would give him his own.  Mr. Durazo didn't want a

2    rented vehicle.

3    Q.    Okay.  And during the course of these days that you

4    followed this investigation in June of this year, did he

5    discuss why he didn't want to rent a vehicle?

6    A.    If he did, I don't recall.

7    Q.    All right.  Now, what else happened on the 13th?

8    A.    Mr. Durazo, Mr. Dove, they departed the motel after

9    letting Mr. Cecena and the other unidentified person out.

10          They drove eastbound on Route 18, which would

11    be West Market Street, for approximately two to three miles,

12    and they discussed getting the -- having the -- trying to

13    get the marijuana to Akron, Ohio, and Mr. Dove getting

14    Mr. Durazo a vehicle.

15          And --

16    Q.    Why did he want the vehicle?

17    A.    I really don't -- I don't know why he would need a

18    vehicle.

19    Q.    Okay.  All right.

20    A.    Just to get around.

21    Q.    Was there any discussion about when the guys would get

22    here with the marijuana, they would need a vehicle?

23    A.    He said "Be ready.  It could be at any time."

24    Q.    Okay.  Now, so at some point in time he was going to

25    come, but other points in time he said he may have to send

1    somebody?

2    A.    Yes.

3    Q.    Okay.  Now, let's go to Saturday, the 14th of June,

4    2008.

15:02:02 5          Were there any meetings between Dove and

6    Durazo?

7    A.    Right.  Mr. Durazo met with Mr. Dove again.  Same

8    scenario; Mr. Dove picked up Mr. Durazo at the Best Western

9    Hotel, the rear door.

15:02:20 10          Mr. Durazo got into Mr. Dove's vehicle and

11   they repeated the same scenario as they repeated on the

12   previous day, the 13th, traveling eastbound on West Market

13   Street for approximately two to three miles, again trying to

14   make arrangements to get the marijuana from Fort Wayne,

15:02:38 15  Indiana to Akron, Ohio, and Mr. Durazo wanting a vehicle.

16   Q.    Okay.  And was that being recorded?

17   A.    Yes, it was.

18   Q.    And while it was going on, was it transmitting so you

19   could hear?

15:02:54 20  A.    Yes.

21   Q.    Okay.  Now, in that particular meeting on the 14th in

22   the car, Durazo was by himself with Dove?

23   A.    Yes, he was.

24   Q.    Okay.  Now, let's go to June 16th through 17, 2008.

15:03:06 25          Did Durazo meet with Dove on that day?

1    A.    He made a phone call to Mr. Dove on the 16th.  He met

2    with Mr. Dove on the 17th.

3    Q.    And who was present during that meeting?

4    A.    On the 17th it was just Mr. Dove and Mr. Durazo.

15:03:24  5    Q.    What did they speak about at that meeting?

6    A.    Getting the marijuana from Fort Wayne, Indiana to

7    Akron, Ohio.

8              Mr. Durazo told Mr. Dove that "These people

9    are all Mexicans.  You can't have a Mexican drive it here.

15:03:40  10    I need a white boy or a black boy to bring it here because

11    if a Mexican brings it, the police will pull him over," and

12    they will subsequently find the marijuana.

13    Q.    Durazo said that?

14    A.    Yes, he did.

15:03:52  15    Q.    Now --

16    A.    He didn't say they would find the marijuana.

17    Q.    Yeah.

18    A.    But he said the police would stop the car and search

19    the car.

15:04:00  20    Q.    Okay.  I guess the police would be profiling Mexicans,

21    is that what he was saying?

22    A.    Mr. Durazo was profiling.  I'm not.

23    Q.    Okay.  Now, was there any discussion of the weight of

24    marijuana during that conversation?

15:04:14  25    A.    I believe he says -- every day it was different

1    amounts, but it always added up to 500.  Like he would say

2    "I want to do 250 and then we'll get rid of that and then do

3    250 immediately thereafter."

4              He asked Mr. Dove "How soon could -- how fast

15:04:34 5    can you get rid of 500 pounds?"

6    Q.    And what did Dove tell him?

7    A.    Mr. Dove said just he could get rid of it.  He said

8    he's got people on standby.  They called it work.  He says

9    "I've got people ready for work."

15:04:48 10            Mr. Dove says "We've been starving.  We've

11   been ready for you to come."  He referred to it as "It's dry

12   out here," meaning dry meaning --

13   Q.    Right.

14   A.    -- there's no marijuana to be sold.  They said they

15:05:02 15   needed to work.

16   Q.    So was Durazo going to wait for the money for the

17   first shipment and then give him more?

18   A.    No, it was going to be fronted to him.

19   Q.    Okay.

15:05:10 20   A.    Mr. Dove wasn't going to have to pay for it upon

21   receipt of the marijuana.

22   Q.    But he was going to front the 250, and was Durazo

23   going to wait in town while he sold --

24   A.    Yes, that was my understanding.  He says "If that goes

15:05:22 25   good, then I'll get you another 250 right away."

1    Q.    All right.  Now, how many conversations or how many

2    meetings did they have on the 16th going into the 17th?  Was

3    it just the one or was it --

4    A.    16th I think was just a phone call.

15:05:38  5    Q.    Okay.

6    A.    I wasn't present if there was.  I think it was just a

7    phone call.

8              The 17th there was a meeting, and the 18th

9    there was two meetings.

15:05:48 10    Q.    All right.  Let's go to the 18th, Wednesday, the 18th,

11    2008, there was a meeting.

12              Was there an actual meeting?

13    A.    There was an actual meeting between Mr. Dove and

14    Mr. Durazo came to the meeting with Mr. Cecena.

15:06:02 15    Q.    And where was that meeting?

16    A.    I wasn't present for that meeting.

17    Q.    All right.  You're aware of it, though?

18    A.    Yes, I'm aware of that.

19    Q.    And was that meeting recorded?

15:06:10 20    A.    Yes, it was.

21    Q.    And what was -- what was the conversation or the gist

22    of that meeting?

23    A.    Here again the logistics of getting the marijuana from

24    Fort Wayne, Indiana to Akron, Ohio.

15:06:22 25    Q.    Okay.  And again that was observed by law enforcement

1  officers and listened to while it was going on, is that

2  right?

3  A.    Correct.

4  Q.    And then in the evening hours of Wednesday --

15:06:32  5  incidentally before we go to that, during all this time, the

6  agents were conversing with me, is that right?

7  A.    Yes.

8  Q.    About what was going on?

9  A.    Yes, sir.

15:06:42  10  Q.    Was there some discussion about actually sending some

11  undercover agents to Fort Wayne to try to get the dope?

12  A.    Yes, we had talked about that.

13  Q.    And what came of that?  We didn't do that, did we?

14  A.    No.

15:06:56  15  Q.    And why didn't we do that?

16  A.    There were several reasons.  Going from one DEA office

17  to another DEA office, not knowing exactly where we were

18  going, who we were going to meet, it was about --

19  Q.    It was logistically a nightmare?

15:07:14  20  A.    -- logistics and officer safety.

21  Q.    All right.  So we decided not to do that, is that

22  right?

23  A.    That's correct.

24  Q.    So did Dove attempt to get these guys to bring the

15:07:22  25  marijuana to the Akron, Ohio area?

1    A.    On the 18th.

2    Q.    And tell us about the meeting on the 18th, the last

3    meeting.  What occurred?

4    A.    Mr. Dove called Mr. Durazo, said he needed to speak

15:07:38  5    with him.  They agreed to meet at McDonald's motel which was

6    located on Wheatley Road in Richfield on Interstate 77.

7                Mr. Durazo showed up with Mr. Cecena to meet

8    with Mr. Dove.

9                The meeting didn't last very long, and

15:07:56  10    subsequently Mr. Dove and Mr. Cecena were arrested.

11    Q.    All right.  So at that time you made it appear like

12    Dove was being arrested, too, is that right?

13    A.    Yes.

14    Q.    All right.  Now, after that first day on Friday, the

15:08:08  15    13th, you never saw the third person, is that right?

16    A.    No.

17    Q.    Okay.  And then after, incidentally, after they were

18    arrested, did either one of them give a statement?

19    A.    I talked with Mr. Cecena.

15:08:22  20    Q.    Briefly or for --

21    A.    Briefly.

22    Q.    Did you read him his rights?

23    A.    After he was Mirandized and he agreed to speak with

24    me, Mr. Cecena told me that just him and Mr. Durazo had came

15:08:38  25    to the Akron, Ohio area.

He told me that they had gotten here a couple
days ago.

I told Mr. Cecena, I said "Well, a couple days
ago would mean you got here on Monday."

And he said "Yeah, on Monday."

I asked him what brought him here.  Mr. Cecena
said he came to this area to look for work.  He was a heavy
equipment operator, and he said Mr. Dove was going to get
Mr. Durazo a job working as a cable installer.

Whenever I told Mr. Cecena that I knew that
wasn't true and I knew exactly what they were up here for,
that's when Mr. Cecena said that he wished to talk to a
lawyer.

Q.    And you didn't ask him any more questions?

A.    We talked about personal things, but nothing case
specific.

Q.    Okay.  Now, during that whole time that they were
recording conversations between Mr. -- either one of these
individuals Mr. Durazo or Mr. Cecena, and Mr. Dove, did they
talk about getting jobs?

A.    I never heard of them talking about getting a job.

Q.    Okay.  All right.

MR. BULFORD:  No further questions, Your
Honor.

THE COURT:  Mr. Ivey.

1          MR. IVEY:  Thank you, Your Honor.

2          CROSS-EXAMINATION OF MARK SCHOONOVER

3     BY MR. IVEY:

4     Q.    You participated or were present during the -- we'll

15:10:10 5    call them -- proffer statements of Ms. Carrington and

6     Mr. Dove, is that correct?

7     A.    Yes, sir.

8     Q.    And during those proffer statements, you learned that

9     Mr. Robinson's marijuana connection was Mr. Durazo, correct?

15:10:24 10   A.    That's correct.

11    Q.    You did not learn in those proffer statements that the

12    marijuana source was Mr. Cecena, did you?

13    A.    No.

14    Q.    In January of 2008, there was a recorded conversation,

15:10:42 15   telephone conversation recorded by law enforcement between

16    Mr. Durazo and Mr. Dove, is that correct?

17    A.    That's correct.

18    Q.    And during that telephone conversation, of course

19    Mr. Cecena did not participate in that conversation, did he?

15:10:56 20   A.    His voice wasn't heard.

21          I don't know if he participated on

22    Mr. Durazo's end.

23    Q.    Well, you don't know because you weren't present on

24    Mr. Durazo's end to know that, is that correct?

15:11:06 25   A.    That's correct.

1    Q.    So that would be just speculation on your part?

2    A.    Exactly.

3    Q.    Correct?

4          Okay.  But now, you did not hear Mr. Cecena's

5    voice on that phone?

6    A.    That's correct.

7    Q.    Okay.  Then on May the 13th Mr. Durazo contacted

8    Mr. Dove again, correct?

9    A.    Yes, sir.

10   Q.    And there was a discussion about bringing some

11   marijuana to the Akron, Ohio area, correct?

12   A.    Yes, sir.

13   Q.    And again Mr. Cecena's voice was not on that telephone

14   conversation, was it?

15   A.    That's correct.

16   Q.    And then again on June 11th of 2008, Mr. Durazo

17   contacted Mr. Dove again, correct?

18   A.    Yes, sir.

19   Q.    That conversation was recorded?

20   A.    Yes, sir.

21   Q.    And in that telephone conversation Mr. Cecena's voice

22   is not heard, is it?

23   A.    That's correct.

24   Q.    Now, on the 13th of June, Mr. Durazo contacted

25   Mr. Dove, correct?

1      A.      Yes.

2      Q.      And by telephone?

3      A.      Yes, sir.

4      Q.      Told him that he was at the Bob Evans restaurant and

15:12:04  5   needed to be picked up, correct?

6      A.      Yes, sir.

7      Q.      He said he was in town with someone, correct?

8      A.      I don't know what verbiage he used.

9              He said he was in town.

15:12:14 10   Q.      Okay.  I'm reading the verbiage from -- did you review

11     the affidavit that was presented as part of the complaint in

12     this case?

13     A.      I reviewed it.  I don't have it in front of me.

14     Q.      Okay.  If the affidavit indicates "Durazo told Dove

15:12:26 15   that he was in town with someone," would you have any reason

16     to dispute that?

17     A.      No, sir.

18     Q.      Okay.  Now, he didn't identify that someone by name,

19     did he?

15:12:34 20   A.      No, sir.

21     Q.      And again throughout these phone conversations, it's

22     Mr. Durazo that's calling Mr. Dove or Mr. Dove may have

23     called Mr. Durazo, correct?

24     A.      Correct.

15:12:46 25   Q.      You don't have any telephone conversations where

1   Mr. Cecena has called Mr. Dove, do you?

2   A.    No, sir.

3   Q.    When Mr. Dove is -- goes to pick up three individuals,

4   I believe Mr. Durazo, he picks up Mr. Cecena and an

15:13:06 5   unidentified male, is that correct?

6   A.    That's correct.

7   Q.    And they're picked up at a Marathon station, correct?

8   A.    Actually they're picked up at a Best Western Motel

9   next to the Marathon.

15:13:16 10   Q.    Best Western Motel.  And you had testified that during

11   the ride when all three of them or four of them are in the

12   car, there's a discussion about getting the marijuana from

13   Fort Wayne to Akron, Ohio, correct?

14   A.    Yeah, they were talking about marijuana, yes, sir.

15:13:32 15   Q.    Okay.  And that's Mr. Durazo talking to Mr. Dove,

16   correct?

17   A.    I can't -- from what I would hear, my -- it was broken

18   up and I couldn't identify who -- I mean, there were several

19   people maybe talking all at one time.

15:13:52 20   Q.    I understand.  When the U.S. Attorney asked you the

21   question, I guess the implication was that Mr. Cecena was

22   present and this unidentified male and they were overhearing

23   this conversation?

24   A.    Yes, sir.

15:14:04 25   Q.    Okay.  Now, are you saying they were present and

1  overheard the conversation, or are you saying that they were

2  participating in the conversation?

3  A.    I'm saying they were in the car.  I didn't hear them

4  participate in the conversation, but there's no doubt that

15:14:16 5  they overheard --

6  Q.    Overheard?

7  A.    -- the conversation and knew what it was about.

8  Q.    Okay.  But you didn't hear them participating,

9  correct?

15:14:24 10  A.    No, sir.

11  Q.    And then in fact, at some point in time, Mr. Cecena

12  and the unidentified male are dropped off at the hotel,

13  correct?

14  A.    Correct.

15:14:34 15  Q.    And then Mr. Durazo continues on in the vehicle with

16  Mr. Dove and they continue to talk about this marijuana

17  transaction, correct?

18  A.    Yes, sir.

19  Q.    Okay.  So this conversation takes place after

15:14:48 20  Mr. Cecena has been dropped off.  He's not part of that,

21  correct?

22  A.    That's correct.

23  Q.    On June, I believe it's the 18th, the meeting you

24  talked about, Mr. Dove ended up calling Mr. Durazo, correct?

15:15:06 25  A.    Yes, sir.

1    Q.    And I believe it was in one of these conversations, I

2    don't want to get date specific, but Mr. Durazo

3    says -- well, scratch that.

4              Let me go back.

15:15:18 5              No marijuana was found in the possession of

6    any of these defendants at the time of their arrest,

7    correct?

8    A.    No, sir.

9    Q.    And as far as information you received from Mr. Dove,

15:15:30 10   no marijuana had made it by Mr. Durazo or Mr. Cecena to the

11   Akron, Ohio area during these dates that you testified to,

12   correct?

13   A.    That's correct.

14   Q.    The whole purpose of this conversation was arranging

15:15:44 15  that, correct?

16   A.    Correct.

17   Q.    And Mr. Durazo said that Mr. Dove would have to

18   arrange for someone to go to Fort Wayne and pick up this

19   marijuana, correct?

15:15:56 20  A.    He was -- I don't know if you want to use the

21   word -- put it like that.

22              They was talking about how to get it here, and

23   Mr. Durazo suggested that if a Mexican was to drive it here,

24   he's going to get traffic stopped.

15:16:14 25  Q.    Right.  And I think your word was that he needed a

1    white guy or a black guy to go pick it up, right?

2    A.    Right.

3    Q.    Because a Mexican or Hispanic person would arouse

4    suspicion, he was concerned of that, correct?

15:16:28 5    A.    Correct.

6    Q.    And Mr. Cecena, of course, is a Hispanic male,

7    correct?

8    A.    Yes, sir.

9    Q.    So Mr. Durazo was indicating you need someone other

15:16:36 10    than someone like Mr. Cecena to bring this marijuana, to

11    pick it up from Fort Wayne, correct?

12    A.    Yes, sir.

13    Q.    And when you talked to Mr. Cecena, he indicated to you

14    that he had come here to look for work, is that correct?

15:16:54 15    A.    Yes.

16    Q.    And you didn't believe that?

17    A.    Well, I know drug traffickers just don't -- in my

18    training and experience, Mr. Durazo is going to talk about

19    drugs with Mr. Dove.  He's not going to be a ride along

15:17:12 20    during those conversations like he did on the 18th.

21    Q.    On, I believe it was, February of 2007, you saw

22    Mr. Durazo at the Best Western Hotel, a meeting with

23    Mr. Robinson, correct?

24    A.    That's correct.

15:17:28 25    Q.    You didn't see Mr. Cecena there with him, did you?

A.   I knew there was another male there but --

Q.   You don't know if --

A.   No, I don't know if that was Mr. Cecena there or not.

Q.   Okay.  The first time you saw Mr. Cecena was during the time period when he was up here when he was arrested, is that correct?

A.   That's correct.

Q.   All right.

     MR. IVEY:  Thank you.  I have nothing further.

     THE COURT:  Mr. Delino.

     MR. DELINO:  Thank you, Your Honor.

     CROSS-EXAMINATION OF MARK SCHOONOVER

BY MR. DELINO:

Q.   Good afternoon, Mr. Schoonover.  I just have a few questions.

     I'll try to be brief.

     Is it fair to assume that Mr. Dove was the primary source of your information on this complaint?

A.   Well --

Q.   I mean, you didn't have -- you weren't working with Mr. Robinson at the time?

A.   No.

Q.   Okay.  Now, and I assume he was given some consideration for this information, is that fair to say?

A.   You have to discuss that with Mr. Bulford.

1    Q.    All right.  When exactly did the telephone

2    interceptions start tape recording?  Was that, say, January

3    of 2008?

4    A.    Between who?  Mr. Dove and Mr. Durazo?

15:18:52 5    Q.    Primarily, yeah.

6    A.    Yes.

7    Q.    Okay.  And sometimes during the course of your

8    testimony you were using the terms "this means" or "that

9    is," for example, when you say Mr. Durazo used the word

15:19:06 10    "300," he doesn't say "300 pounds of marijuana."

11              That's kind of what you -- you were explaining

12    what that means?

13    A.    When he said "300," I know it to mean 300 pounds of

14    marijuana.

15:19:18 15    Q.    All right.  And now, January 13th -- I'm

16    sorry -- January of 2008 there's a recorded telephone

17    conversation regarding the delivery of marijuana, but none

18    is delivered, is that correct?

19    A.    That's correct.

15:19:36 20    Q.    Same thing happens in May of '08, there's a

21    discussion, agreement to deliver, and nothing is delivered?

22    A.    That's correct.

23    Q.    Same thing on June 11th?

24    A.    No, June 11th he said he'd be here in two days with, I

15:19:54 25    think, 250 pounds or 300 pounds.  I can't remember the

1    amount.

2    Q.    And that was referring to June 13th?

3    A.    I'm sorry, he said he would be here in two days, which

4    June 13th would be two days.

15:20:04 5    Q.    And again nothing was recovered at that point either?

6    A.    Pardon?

7    Q.    Nothing is recovered, nothing is delivered on that

8    particular day either?

9    A.    No, sir.

15:20:10 10    Q.    All right.  Now, in regard to the -- some reference

11    that there was something in a warehouse in Indiana,

12    contraband, that hasn't been recovered to this point?

13    A.    Not to my knowledge.

14    Q.    In fact, we're not even aware where that place is --

15:20:34 15    A.    That's correct.

16    Q.    -- at this point?

17          Did any -- did any money change hands during

18    any of these meetings?

19    A.    Only the money that Mr. Dove give to Mr. Durazo.

15:20:48 20    Q.    And what was that?

21    A.    Well, for lack of a better term, living expenses.  He

22    paid for his room, give him money for motel, food.

23    Q.    And I think he agreed to provide him with a vehicle or

24    something?

15:21:00 25    A.    Yes, sir.

1    Q.    But he wasn't -- again it's not your understanding or

2    allegation here that he was supposed to give Mr. Durazo a

3    vehicle or transfer ownership to a vehicle; just pretty much

4    the use of a vehicle, is that fair?

15:21:14  5    A.    From my understanding.

6    Q.    Okay.  And lastly, is it fair to say that all of the

7    meetings between Mr. Durazo, Mr. Dove, were initiated by

8    Mr. Dove at the behest of the government?

9    A.    No.  I believe the June 18th meeting that happened

15:21:34 10   around -- in early afternoon, I believe that meeting was

11   initiated by Mr. Durazo.

12          And on June 13th it was Mr. Durazo that called

13   Mr. Dove up and asked him to come pick him up.

14   Q.    And that was because he indicated he had lost his car,

15:21:54 15   he didn't have a mode of transportation, correct?

16   A.    Well, I didn't know what the reason was.  He just said

17   come pick him up.

18   Q.    Well, I mean you stated in your affidavit that he

19   called and stated that he was in a motel at a restaurant and

15:22:08 20   his car had broken down, is that correct?

21   A.    I believe, yes.

22          MR. DELINO:  Okay.  Nothing further.

23          THE COURT:  Redirect, Mr. Bulford?

24          MR. BULFORD:  Briefly, Your Honor.

25

1    REDIRECT EXAMINATION OF MARK SCHOONOVER

2  BY MR. BULFORD:

3  Q.    During the course of those meetings between Durazo and

4  Dove, Durazo spoke -- did he speak about his relationship

15:22:28  5  with Chevaliee Robinson?

6  A.    Yes, he did.

7  Q.    What did he say?

8  A.    He said -- pardon?

9  Q.    What did he say?

15:22:36 10  A.    He said that Mr. Robinson owed him $4 million.  That

11  he had to sign over some properties, a ranch of his, to help

12  settle the debt he made.

13        He alluded to the fact that there's people

14  that get killed for owing $10,000.

15:22:58 15  Q.    Did he also talk about the volume of marijuana he

16  moved?

17  A.    They talked about it in the thousands, I believe 1500

18  a month, 1500 pounds a month.

19  Q.    And did he indicate that he wanted to get that going

15:23:16 20  back again?

21  A.    He told Mr. Dove that "If this goes right," they can

22  make -- "we can make a lot of money and it can be just like

23  it was before."

24  Q.    Now, incidentally again, Mr. Cecena was present on

15:23:28 25  Friday, June 13th?

1   A.   Yes.

2   Q.   With --

3   A.   During.

4   Q.   -- Durazo?

15:23:36 5   A.   Right.

6   Q.   And Mr. Cecena traveled from Mexico or the southwest

7   United States with Mr. Durazo, right?

8   A.   From, yes, Tucson to Akron, Ohio.

9   Q.   And Mr. Durazo brought Mr. Cecena to the meeting on

15:23:48 10   June 18th?

11   A.   He drove the vehicle.

12   Q.   He drove?

13   A.   He drove the vehicle.  Mr. Durazo was a passenger.

14   Q.   And he participated in the meeting?

15:23:58 15   A.   Yes, he did.

16   Q.   And then in the evening hours of June 18th, the

17   meeting at the McDonald's on Wheatley Road --

18   A.   Again he drove Mr. Durazo.

19   Q.   And he was present at a meeting where they discussed

15:24:12 20   dope?

21   A.   Yes.

22   Q.   You were present in the interviews of Amanda

23   Carrington?

24   A.   Yes.

15:24:18 25   Q.   And she described Mr. Durazo, Mr. Durazo, is that

1  right?

2  A.    Yes.

3  Q.    She described that he had come to her home?

4  A.    She said he had been to her home before, and in

5  February of '07 whenever Mr. Durazo was in this area during

6  surveillance he drove right past Mr. Robinson,

7  Ms. Carrington's residence.

8  Q.    Yeah, but also did Ms. Carrington describe that he

9  always had an older travel companion?

10  A.    She said, yeah, I believe there was an older Hispanic

11  male that was always with him.

12  Q.    And Mr. Cecena was with him this time, is that right?

13  A.    Yes, sir.

14  Q.    And the other gentleman, what was his age, the unknown

15  male?

16  A.    I don't know.

17  Q.    Okay.  All right.  Incidentally, marijuana is a

18  Schedule I substance?

19  A.    Schedule I controlled substance.

20         MR. BULFORD:  Nothing further, Your Honor.

21         THE COURT:  Thank you, Officer.

22         You may step down.

23         (Witness excused).

24         THE COURT:  Mr. Bulford, do you have any other

25  evidence or proffers?

1    MR. BULFORD:  I proffer the Pretrial Services

2    report, and no further evidence.

3        THE COURT:  All right.  Mr. Ivey, do you have

4    any proffers or evidence on behalf of Mr. Cecena?

15:25:26 5        MR. IVEY:  Just argument, Your Honor.

6        THE COURT:  All right.  Very well.

7    Mr. Delino.

8        MR. DELINO:  Likewise.

9        THE COURT:  All right.  Let's start with

15:25:32 10   probable cause.

11       Mr. Bulford, your argument on probable cause.

12       MR. BULFORD:  Well, Your Honor, what we've

13   established through the witness is that I'll start with both

14   defendants came to Ohio after Mr. Durazo had contacted

15:25:52 15   Mr. Dove and indicated he wanted to come here to meet with

16   him to arrange the delivery of marijuana.

17       That was recorded.  And the witness summarized

18   that conversation, but it's a recorded conversation.

19       And actually then on Friday, the 13th,

15:26:12 20   Mr. Durazo called Mr. Dove and said they were here and they

21   went over, Dove went over and picked them up.  And you heard

22   a description from the witness of that meeting, and again

23   that meeting was recorded.

24       And during that meeting were all three

15:26:26 25   gentlemen or four gentlemen, Mr. Dove, Mr. Durazo,

1     Mr. Cecena, and the unknown individual, they were in the car

2     and discussing the fact that the marijuana was in Fort

3     Wayne.  Mr. Durazo wants to get it here so he can front it

4     to Mr. Dove who can then distribute it.

15:26:44  5          They're charged in this complaint with

6     conspiracy to distribute marijuana and to possess with

7     intent to distribute marijuana.  A conspiracy actually is

8     just the agreement to do it.

9          There's clear evidence right there of the

15:26:56 10   agreement, without going further into the other things that

11    occurred that you heard from the witness.

12         Right there there's the agreement to

13    distribute marijuana, and that actually meets -- we've

14    established probable cause just with those conversations in

15:27:10 15   that meeting and the meeting on Friday the 13th.

16         Now, it gets better because they have several

17    other conversations which you heard about back and forth

18    where Durazo was discussing where the marijuana is and "how

19    we have to get it here," and at one point in time he

15:27:28 20   actually suggests Dove get a crew to go get it.

21         And even the last meeting, again these are all

22    recorded and these conversations all talking about

23    delivering marijuana to Mr. Dove.

24         The conspirators in this case are Mr. Durazo,

15:27:44 25   Mr. Cecena, the unknown individual, the people who have

1    delivered the marijuana to Fort Wayne, and the source, the

2    ultimate source of -- excuse me -- of the marijuana, the

3    marijuana from Mexico.

4            Obviously Mr. Dove cannot be counted as a

15:28:02  5    conspirator in this case because only in November when he

6    had conversations with him, when he went down there to meet

7    with him, was he still a co-conspirator or a conspirator.

8            He was arrested on December 5th.  Began

9    cooperating.  Once he's a cooperator, you can't count him as

15:28:18 10    a co-conspirator in this case.

11            I think there's plenty of evidence to

12    establish probable cause.

13            That's my argument on probable cause.

14            THE COURT:  All right.  Thank you,

15:28:28 15    Mr. Bulford.

16            Mr. Ivey, on behalf of Mr. Cecena.

17            MR. IVEY:  Thank you, Your Honor.

18            Your Honor, there's several things that are

19    undisputed.

15:28:42 20            One is that Mr. Cecena never was in possession

21    of any marijuana and there's been no vehicle that he was

22    associated with where marijuana was found.  It was not found

23    in the hotel or anything of that like.  So that's it.

24            What this case really boils down to is the

15:29:00 25    nature of contacts between co-defendants and Mr. Dove.

The government argues and even said in
argument that there were conversations, but I was particular
when I questioned the agent about Mr. Cecena's actual
participation and role in these conversations, and I got
particular answers, and those were that the phone calls were
either from Mr. Durazo to Mr. Dove or Mr. Dove to
Mr. Durazo.

There were never any phone calls initiated by
Mr. Cecena or called to Mr. Cecena.

Mr. -- I asked the agent again, there was this
thrown out that when Mr. Durazo came, he was with some older
gentleman, but that person hasn't been identified.  And
Mr. -- and I asked specifically about this, and Mr. Durazo
indicated to Mr. Dove on June 13th he was in town with
someone.  He didn't say "I'm in town with Mr. Cecena; you
know, the guy I'm always here with."

So I don't think that that establishes
probable cause at all.

The only thing to put Mr. Cecena into this is
the fact that supposedly he was present when Mr. Durazo was
making comments and discussing about arranging or bringing
this marijuana here, but I don't think that is sufficient
for several reasons.

I asked again specifically "Was it your
understanding that Mr. Cecena participated in these

1    conversations or that he was merely present?"

2          The answer was "I didn't hear his voice, but

3    he was clearly here and he was present."

4          And I would bring to the Court's attention

15:30:44  5    that this issue has been dealt with by the Federal Courts

6    quite extensively, and that is mere presence, even guilty

7    knowledge, even close association with a co-conspirator are

8    insufficient standing alone to support a conviction for

9    conspiracy. *United States versus Lyons*, 53 F. 3d 1198 at

15:31:06 10    1201.

11          And again even more specific, the Courts have

12    dealt with passengers in a car, and the agreement element is

13    frequently implicated in passenger cases in which a

14    passenger in a vehicle or aboard a vessel is charged with a

15:31:22 15    conspiracy count.

16          This situation occurs most often in narcotics

17    cases.  If the evidence shows nothing more than the mere

18    status of being a passenger, it would be insufficient to

19    prove conspiratorial agreement and knowing participation in

15:31:36 20    an illegal venture.

21          It's quite obvious from what happened here

22    that Mr. Dove and Ms. Carrington identified Mr. Durazo as

23    the contact.  It's also quite clear that the whole

24    conspiracy -- the whole investigation, the whole undercover

15:31:52 25    work was done to unearth Mr. Durazo.

1          Mr. Cecena, the most the government could

2     indicate, and that's what they argue, is that he's present

3     during conversations and that is even if he knows Mr. Durazo

4     is trying to work this out for marijuana, that's

15:32:10  5     insufficient to make him a co-conspirator in this particular

6     case.

7          I think it's also more telling is the actions

8     of Mr. Durazo after this initial phone -- I mean, I'm sorry,

9     this initial car ride, and that is that Mr. Durazo, although

15:32:28 10    he may have had a conversation about this, Mr. Cecena and

11    the unidentified male were dropped off at the hotel and then

12    Mr. Durazo and Mr. Dove continued on and discussed this

13    particular transaction.

14          So obviously if he's a co-conspirator, then

15:32:46 15    why not have him around?  And we don't know what pretext was

16    given to Mr. Cecena to come up here, he thinks he's coming

17    up for.  He's a captive audience at this particular point.

18    And even if he's not, it's insufficient under the law,

19    federal conspiracy law, to establish him as a co-conspirator

15:33:08 20    in this case.

21          So we'd ask this matter be dismissed against

22    Mr. Cecena.

23          Thank you.

24          THE COURT:  Thank you, Mr. Ivey.

15:33:14 25          Mr. Delino.

1          MR. DELINO:  Thank you.

2          Briefly, Your Honor, there obviously is some

3    evidence of conversations and that is pretty much

4    undisputed, but no other steps I believe were taken in

15:33:28  5    furtherance of this conspiracy.

6          And that is a must for a conspiracy

7    allegation.

8          Finally, I think, the last thing I would like

9    the Court to note is that the first contact regarding this

15:33:42 10    alleged conspiracy, alleged transaction, takes place

11    November of 2007 at which time Dove goes to Arizona and

12    allegedly has a conversation with Mr. Durazo.

13          Eight months later there's still nothing to

14    show for it except conversation.

15:34:10 15          We would ask the matter be dismissed as well,

16    Your Honor.

17          THE COURT:  Rebuttal, Mr. Bulford?

18          MR. BULFORD:  First, Your Honor, let's make

19    this clear, this is a violation of Title 21, Section 846 and

15:34:24 20    no overt acts are necessary to prove.  All that is necessary

21    to prove is the agreement to possess with the intent to

22    distribute or to distribute the marijuana.  So there's no

23    overt acts necessary, although you have many overt acts

24    here.

15:34:38 25          These people came to Ohio to talk to Dove to

1    arrange for the delivery or the acquisition of the marijuana

2    they stated was in Fort Wayne at the time.  So we have

3    established that.  And just the conversations that are

4    recorded between Durazo and Dove establish the conspiracy.

15:34:58  5         Now, as to Mr. Ivey's argument or the

6    statements about the case law, and what he's quoting is case

7    law that goes to the burden of proof beyond a reasonable

8    doubt at a jury trial.

9         We're in a preliminary hearing where it is our

15:35:18  10   obligation to establish probable cause to believe that his

11   client was involved in a conspiracy to distribute marijuana.

12        His client came here from the southwest United

13   States with Mr. Durazo, who was all about moving marijuana

14   to Akron, Ohio.

15:35:38  15        The statement he made about coming here for

16   work is pretty laughable.  I mean, there's a lot more work

17   in the southwest United States than there is in Akron, Ohio.

18   We all know the economic situation here.

19        But putting that aside, let's go to probable

15:35:56  20   cause.  He was at the meeting on the 13th in the car when

21   they discussed the dope.  He came here, he was present when

22   Durazo asked Dove to go get a motel room in Dove's name, not

23   their name.

24        Then on the 18th of June, he drives Durazo to

15:36:20  25   the meeting in the afternoon where again they are discussing

1    the logistics of getting the marijuana here.

2              In the evening he drives him to the meeting.

3              This is an individual who knows that

4    Mr. Durazo is speaking to Mr. Dove about marijuana.  He's

15:36:40  5    present on Friday, the 13th, during that meeting, and he

6    goes back -- he actually drives him to meetings with

7    Mr. Dove, knowing that all they are discussing is a

8    marijuana trade.

9              There's probable cause to believe this

15:36:58 10    gentleman is involved in the conspiracy, and at this point

11    in time that's all we are required to establish.

12              So I'd ask the Court to find there's probable

13    cause as to both defendants, and refer the matter to the

14    federal grand jury.

15:37:08 15              Thank you.

16              THE COURT:  I do find that there's probable

17    cause with respect to both defendants and refer these cases

18    to the grand jury.

19              Your argument on detention, Mr. Bulford.

15:37:18 20              MR. BULFORD:  Your Honor, my argument on

21    detention is basically as presented by Pretrial Services.

22              As to Mr. Durazo, he is a Mexican citizen, has

23    no ties to the area.  The presumption, statutory presumption

24    also applies as this is a case as charged right now that

15:37:40 25    carries a mandatory minimum five years, a maximum 40 years,

1    so the statutory presumption is there.

2                We tie together that with the factors the

3    Pretrial Services has pointed out, no family or community

4    ties to the Northern District of Ohio, not a citizen of the

15:37:56  5    United States, extensive ties to Mexico, lack of stable

6    employment, no assets, and a number of aliases used in the

7    past, and I believe that there's no set of conditions that

8    could assure his appearance or the safety of others in the

9    community.

15:38:10  10                As to Mr. Cecena, again the presumption

11    exists.  He's looking at a mandatory minimum five years, a

12    maximum of 40 years.  He does have -- he has some

13    convictions for things such as obstruction, resist public

14    officer, he was convicted and fined, second in 1989 he had

15:38:40  15    obstruction, resist public officer, disposition unknown in

16    that one.  He had a possession of controlled substances in

17    2001 in Hollister, California; a failure to appear which was

18    originally -- I mean finally dismissed.

19                And there's apparently a warrant pending for

15:39:02  20    failure to provide child support out of Monterey County

21    Sheriff's Office.

22                Those factors, including the fact he has no

23    family ties to this district, his financial ties or

24    employment to this district, and he has minimal ties to

15:39:20  25    Arizona where he claims he lives, and has a warrant for

1    failure to pay child support out of California, at this time

2    I'd ask the Court to detain him also at this time.

3              THE COURT:  Mr. Ivey, your argument on

4    detention.

15:39:34  5              MR. IVEY:  Thank you, Your Honor.

6              I would just indicate to the Court that one

7    thing I do agree with the government on is that they, with

8    respect to Mr. Cecena at least, they are the beneficiaries

9    of good fortune of a very, very, very low standard of proof

15:39:54 10   without which I don't believe Mr. Cecena should be

11   rightfully sitting there in an orange jumpsuit.

12             But being that as it may, I would ask the

13   Court to consider the fact that basically under the law, the

14   evidence against him is lacking, to say the least.

15:40:12 15             With that in mind, I would also turn to the

16   record that the government went through quite quickly.  The

17   obstruction case is about 20 years old.  The case of

18   obstructing/resisting was, the disposition unknown, but the

19   disposition is unknown to Mr. Cecena.  That case was

15:40:34 20   dismissed.

21             In 2001, the possession of controlled

22   substance count, Mr. Cecena was permitted to go through

23   basically a treatment in the way of conviction on that

24   count.  There were no warrants on that count.  He showed up

15:40:52 25   for everything.  He completed the program successfully and

1    then it was dismissed.

2            The child support issue remains an issue, Your

3    Honor.

4            The failure to appear count that the

15:41:02  5    government brought up, I would ask the Court to go one

6    column over to note that that was dismissed in 2002.

7            The child support issue is one that Mr. Cecena

8    is dealing with, the child of which -- that is the subject

9    of that actually resides with and is under the care of

15:41:20 10    Mr. Cecena and his parents in Tucson, Arizona.

11            I do believe, Your Honor, that given when you

12    delve into the existence of any significant or meaningful

13    record, one, it does not show contempt for the Court in any

14    way or failure to appear for criminal charges.

15:41:40 15            In fact, it shows cooperation in meeting those

16    types of situations, and they have come out with largely

17    dismissals or compliance with treatment programs for

18    Mr. Cecena.  And I think that he's an individual that can be

19    relied upon to appear in court in this matter, and because

15:42:00 20    of the very lacking evidence in this case, wants very much

21    to meet these charges.

22            I would ask the Court to impose a condition of

23    pretrial release for him.

24            Thank you.

15:42:10 25            THE COURT:  Thank you, Mr. Ivey.

1          Mr. Delino.

2          MR. DELINO:  Thank you, Your Honor.  May it

3     please the Court.

4          Mr. Durazo has been a resident of the United

5     States for 22 years, most of that time in Tucson, Arizona.

6          He is living with the mother of his children

7     Emma Zarate and they do have three children, and he's 41

8     years old, which means he's spent more than half his life as

9     a resident of the U.S.  He has a green card.  He is a legal

10    resident.

11         And he has, you know, I don't want to say a

12    minimum criminal record.  He has none.  I believe he has a

13    traffic offense, a DUI.

14         The PSR refers to a charge of aggravated

15    assault and resisting arrest.  As the Court can see by

16    reviewing that, he is simply fined, guilty to Count 4.  It

17    doesn't say what Count 4 is, but it is apparent that if it

18    was an aggravated assault or resisting arrest, he certainly

19    would have been more than fined.

20         There at least would have been some condition

21    of probation or something to that effect.

22         He is essentially, again, his significant

23    other, the mother of his children, Emma, is a United States

24    citizen, as are his three children.

25         Yes, he does have family in Mexico, that's

1    admitted, but I believe he is, based on his lack of record,

2    based on the fact he has lived most of his life in the

3    country legally, at least most of that time legally, I

4    believe he would be a good risk for pretrial release.

15:43:48  5         Thank you.

6         THE COURT:  Thank you, Mr. Delino.

7         Any rebuttal, Mr. Bulford?

8         MR. BULFORD:  No, Your Honor.

9         THE COURT:  Motions are taken under

15:43:54 10  advisement.

11         They are remanded to the custody of the United

12  States Marshals pending my ruling on those motions.

13         Mr. Bulford, anything further on behalf of the

14  United States?

15:44:02 15         MR. BULFORD:  Nothing, Your Honor.

16         THE COURT:  Mr. Ivey, anything further on

17  behalf of Mr. Cecena?

18         MR. IVEY:  Nothing, Your Honor.

19         THE COURT:  Mr. Delino, anything further on

15:44:08 20  behalf of Mr. Durazo?

21         MR. DELINO:  Nothing.

22         THE COURT:  Being no further business before

23  this Court on these cases, we are in recess.

24         (Proceedings concluded).

25              - - - - -

1            C E R T I F I C A T E

2                    I certify that the foregoing is a correct

3      transcript from the record of proceedings in the

4      above-entitled matter.

5

6

7

8      **/s/Susan Trischan**

9      /S/ Susan Trischan, Official Court Reporter

10     Certified Realtime Reporter

11

12     7-189 U.S. Court House

13     801 West Superior Avenue

14     Cleveland, Ohio 44113

15     (216) 357-7087

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3    WITNESSES:                                        PAGE

4      DIRECT EXAMINATION OF MARK SCHOONOVER              3

5      BY MR. BULFORD

6      CROSS-EXAMINATION OF MARK SCHOONOVER             24

7      BY MR. IVEY

8      CROSS-EXAMINATION OF MARK SCHOONOVER             31

9      BY MR. DELINO

10     REDIRECT EXAMINATION OF MARK SCHOONOVER          35

11     BY MR. BULFORD

12

13                         * * * * *

14

15

16

17

18

19

20

21

22

23

24

25